IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| Plaintiff-Respondent, § | |
| § | |
| V. § | CRIMINAL ACTION NO. H-10-862-1 |
| § | CIVIL ACTION NO. H-14-2938 |
| CARLA LEE JOHNSON, § | |
| § | |
| Defendant-Movant § | |

**MEMORANDUM AND RECOMMENDATION**

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Carla Lee Johnson's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.235),[1] and Memorandum in Support (Document No. 236), the United States' Motion to Dismiss as Time Barred and Motion for Summary Judgment (Document No. 249), and Movant's Response to the Government's Motion to Dismiss as Time Barred and Motion for Summary Judgment (Document No. 251). After reviewing Movant's § 2255 Motion and Memorandum in Support, the Government's Motion to Dismiss as Time Barred and Motion for Summary Judgment and Movant's Response to the Government's Motion, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Movant Carla Jean Johnson's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document No. 235) be DENIED, and the United States' Motion to Dismiss as Time Barred/Motion for Summary Judgment (Document No. 249) be

---

[1] Carla Jean Johnson's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-14-2938 and at Document No. 235 in Criminal Action No. H-10-862.

GRANTED.

I.     **Procedural History**

Movant Carla Jean Johnson ("Johnson"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255.  This is Johnson's first attempt at § 2255 relief.

On December 14, 2010, Johnson, Donnie Hue Smith, Royce Lamar Smith and Nettie May Smither were charged by Indictment with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count One) (Document No. 8).   On April 21, 2011, Johnson pleaded guilty without a written Plea Agreement. (Document Nos. 68, Transcript of Rearraignment Hearing, Document No. 246).  The transcript of his Rearraignment hearing confirms that Johnson understood the charges against her, the rights she would give up if she pleaded guilty, the possible penalties, and  the sentencing process. (Document No. 246, p.5-11).  The record further reflects that the Government summarized the facts that it was prepared to prove if the case proceeded to trial.  (Document No. 246, p. 12-15).  In response, Washington confirmed the accuracy of the summary and her role in the offense. (Document No. 246, p. 15-16).  The Prosecutor described Johnson's role in the conspiracy as follows:

> Ms. Minnis:  Ms. Johnson worked at Columbia Lloyds Insurance Company.  Johnson was hired by Columbia as controller in May of 2005.  She set up the banking system for Columbia with Wachovia Bank, a financial institution in Houston, Texas, with headquarters in North Carolina.
>
> Bank wires and Automated Clearing House, or ACH, transfers of money from Columbia's accounts that were initiated in Houston, Texas, were transmitted to New York among other places outside the Southern District of Texas.
>
> Beginning in at least by July 11th, 2007, Johnson diverted Columbia's funds to herself and at least ten others in this conspiracy using wire transfers, ACH transfers, and some checks that were written on the Wachovia Bank account of Columbia Lloyds.

Johnson gained access to Columbia Lloyds account through her job as controller; although, she didn't have any authority to disburse the funds from this account in the manner that she did.  Columbia learned of these unauthorized payments after Saturday, July 11th, 2009.  That was the date when she and Mr. Donnie Smith presented a 180,000-dollar check that was drawn on Columbia's Wachovia account.  The bank officials at Wachovia branch . . . questioned the authenticity of check which was not allowed to be deposited at the time.  Bank officials contacted an employee of Columbia Lloyds on Monday, July 13th of 2009 and found that the check was not authorized.

Prior to this check being presented in July of 2009, Johnson had sent at least ten co-conspirators the amount of $939,347.27 from the insurance company account which was without their consent and by the use of the interstate banking system including federal wire.

A total intended loss of $1,119,347.27 was found by the investigators and the employees of Columbia Lloyds after reviewing bank records of the company as well as the co-conspirators.

Johnson told the co-conspirators to expect money into their bank accounts and then she wired monies from Columbia Lloyds bank account to the various co-conspirators including Royce Smith and Donnie Smith.  She sent monies to others from this account who in turn sent it to Nettie Smither, among other people.

These three co-defendants have already pled guilty before this Court.

The scheme involved the conspirators in turn depositing some of the monies that they received into either co-conspirators bank accounts or forwarding it on to Ms. Johnson's bank account.  The monies that arrive—the monies arrive via check as well as ACH transfers and wire transfers which had traveled in interstate commerce from Houston to New York.

Donnie Smith's local bank account was approximately $174,914.19 from Columbia Lloyds Wachovia account from January 2009 until July of 2009.  Royce Smith's local bank account was approximately $168,474.91 in funds from Columbia's bank account.  Neither of these defendants had insurance policies or claims of any sort with Columbia Lloyds.  These defendants in turn transferred some of the funds, they kept part of the money per their agreement with Johnson, and the funds that were transferred at Carla Johnson's direction went into other conspirators bank accounts and back to Carla Johnson's bank account.

Nettie Smither gave a statement to agents in which she said Johnson instructed her that Smither's bank account receiving monies from various other people not directly from Carla Johnson but from these other people who received it from Columbia Lloyds.  Smither knew these people were either friends or relatives of Ms. Johnson's.

And Johnson was told by Smither that she could keep part of the monies but she had [to] give part back to Johnson either in cash or transfer the money to Johnson's bank account. Smither said she knew Johnson was taking money from Columbia's bank account and sending it to Donnie and Royce Smith and others in this conspiracy.

Agents have spoken to other individuals who received money that Johnson illegally deposited into accounts from Columbia Lloyds Wachovia account. They admitted to the same scheme. . . Bank records showed evidence of the money deposited from Columbia into the con-conspirators accounts as well as the defendant's account and other unindicted co-conspirators. At no time did any of the conspirators have the consent of Columbia Lloyds Insurance Company to receive these monies. Wire transfers, ACH, and checks were made to appear to be legitimate insurance payments by addressing the monies to a fake insurance agency containing the name of the co-conspirator or referencing a policy number which in one instance was actually attached to a legitimate policy holder who did not have a claim. There were other misrepresentations also made in terms of the names and reasons put on the check or the wire transfer.

The Court: Ms. Johnson, tell me in your own words what it is you did to commit the crime you are pleading guilty to this morning.

The Defendant: Like she indicated, I would do wire transfers from the Wachovia account to various accounts. I don't know at this time if, as far she made the comment, about I did it without their consent. I do not agree with that. They knowingly received it. And basically just transferred from one account–from the Columbia Lloyds account to their account.

Ms. Minnis: Without the consent was of the company not the co-conspirators.

The Defendant: Thank you. (Document No. 246, p. 12-16)

Prior to sentencing, a Pre-Sentence Investigation Report ("PSR") was prepared. (Document No.94). Because Johnson was convicted of wire fraud she had a base offense level of 7. Because the loss attributed to the conspiracy to commit wire fraud was $1,119,347.27, her base offense level was increased 16 levels under U.S.S. § 2B1.1(b)(1)(1). Because the offense involved sophisticated means, the offense level was increased two levels under U.S.S.G. § 2B1.1(b)(9)(C). Johnson had a base offense level of 25. Because Johnson was deemed an organizer/leader of a criminal activity that involved five or more participants, her offense level was increased four levels under U.S.S.G.

§ 3B1.1(a). Because Johnson abused a position of trust under U.S.S.G. § 3B1.3, the offense level was increased two levels. Because Johnson accepted responsibility for her actions and did not in a timely manner, under U.S.S.G. §3E1.1(a) and (b), her offense level was reduced three levels. With an adjusted offense level of 28, and with a criminal history category of II, Johnson had an advisory guideline sentencing range of 87 to 108 months. Johnson filed written objections to the PSR. (Document No. 120). Johnson argued that a two level enhancement for sophisticated means was not warranted because there was no evidence supporting the increase. Based on Johnson's calculations she should have an advisory guideline sentencing range of 70 to 87 months. The Government responded to Johnson's objections to the PSR. (Document No. 121). According to the Government, Johnson had gone to great lengths to divert money from her employer and that "[h]er scheme to defraud her employer was intricate and involved concealment of the source of the funds that she ultimately received." (Document No. 121, p. 1). The record further shows that Government filed a sentencing memorandum, in which it argued for an upward departure from the advisory sentencing guideline range of 87 to 108 months. (Document No. 128). In support of the upward sentencing departure, the Government cited to Johnson involving both her daughters (ages 13-14 and 9-10) in the fraudulent activity. The Government further pointed to Johnson's prior convictions for stealing from two of her prior employers: Nabors International and Affiliated Companies. The Government further argued that an upward departure was warranted based on the adverse impact Johnson's fraud, along with her co-conspirators, had on Columbia Lloyd's Insurance Company. With respect to the non-monetary harm incurred by Columbia Lloyds, the government argued in pertinent part:

> Ironically, Johnson has chosen to bite the hand that fed her by stealing from at least two of her employers, first from Nabors International and Affiliated Companies (PSR Par. 30) and now from Columbia Lloyd's Insurance Company. Both companies trusted her to take care of their accounting and other financial needs. She abused that trust and has been rightly assessed a two level increase pursuant to U.S.S.G. § 3B1.3

> (PSR Par. 24). However, as noted in the PSR at Par. 69, an additional factor related to Johnson's employment has been identified: pursuant to U.S.S.G. § 2B1.1 comment (n.19(A)(ii), the Court may upwardly depart if the offense caused or risked substantial non-monetary harm. Due to Johnson's fraud, along with her co-conspirators, Columbia Lloyd's Insurance Company was audited by the Texas Department of Insurance. Afterwards, the company was given the option of either terminating their existing management or face being placed in an administrative oversight system that required an onsite trustee who would review and approve/disapprove company decisions. The management team in place during the two year period of this fraud was replaced. It stands to reason that when the authors of this guideline crafted this guideline and comment, they had in mind this exceptional situation where persons uninvolved with the fraud lost their positions because of the defendant's theft. Losing a management position and salary is a horrible result for the former President and Vice President of Columbia Lloyd's, but such loss is exacerbated in a down economy such as the one we are in presently. Surely the Court will consider the ripple effect the defendants' greed and thievery had for this small, locally owned insurance company and the two individuals whose heads rolled because of the fraud perpetrated by Johnson and her co-defendants. Such a result merits an upward departure (or in the alternative, an upward variance) and is anticipated by the guidelines. (Document No. 128, p. 4-5).

Lastly, the Government pointed to Johnson's prior criminal conduct, namely, that she was on felony probation at the time of the instant conspiracy. Johnson responded to the Government's Sentencing Memorandum (Document No. 152).

The record shows that Johnson was sentenced on September 9, 2011. Johnson argued for a sentence at the bottom of the guideline range. In contrast, the Government re-urged its request for an upward departure.

> Ms. Minnis: Your Honor, there is no evidence of what Mr. Cox has just said, that the Defendant has led a crime-free life up to the age of 33 when she and her co-defendant in this case got in trouble stealing money from her prior employer. In fact, what the evidence shows is that there are no criminal convictions prior to her being caught for stealing $145,000 from [Nabors] International, her employer, who back then, I am sure, was in a trust position, too, where they trusted her as an employee to do her job, not to steal from them, not to set up various companies– her and Mr. Royce Smith setting up various companies and diverting monies that they had no right to have.
>
> You understand what she got as a punishment. She went to prison. She had to pay restitution up front. She got placed on shock probation as a result of saying a lot of

the same things that she's saying in this instance– she's sorry, she wants to do better, she doesn't want this to ever happen again, she wants to lead a productive life.

Well, that's just another repeat of 2004 and 2005 when she was released on shock probation. And that's in the presentence report. On pages 7 and 8 of the presentence report the probation officer, to her credit, went back and found that she had said during her – or after she was fired from [Nabors] International she told them she was sorry, she wanted to make it right, she never thought she'd get caught and the reasons why she did it.

Obviously, she wants you to again believe there are more reasons why– when we step forward into 2007 to 2009, there are other reasons that she did again steal, but she's done it on a huge mammoth scale as compared to what she and Royce Smith did before.

But this time she's saying that she wants to repay her debts, her debt to the victim and society, and she wants to return and be a productive citizen.

What evidence–what does it take for someone like Carla Johnson to not have learned the first time around, when she's sent to state prison and being given the biggest opportunity of her life, to straighten up and fly right, to pay back monies, to work, to be honest? But, yet, she goes into another company and shortly after she gets released on shock probation and, for lack of a better work, she becomes a corporate black widow spider. She uses their funds and their monies after gaining their trust, their confidence, to steal from the, and she did it in probably one of the more sophisticated ways that I have seen in quite some time involving now over – I think we're up to 13 or 14 different people that she's involved. And, yes, she set up no shell companies, but she sure did do a lot of things to hide and disguise the manner in which she was stealing that company blind.

And, as this Court knows, Columbia Lloyds Insurance Company is not a Nationwide, it's not a State Farm. It's not one of the huge insurers in the nation. It's a small family-owned business located here in Houston, Texas, that writes policies for individuals who have lower-priced homes. They serve that type of market.

The monies that she was taking were these people's policy payments. That was what she was taking to fill her own coffers, to fill other people's pockets and to do things for her kids. What is really insulting, though, is the manner in which she used all these people, to include her own two children's bank accounts, to clean up some dirty money. That's essentially what she did. And she had other people that were employed at Columbia Lloyds to assist her in that regard.

It's outrageous. She has not learned from the very difficult lesson that she must have had to have undergone, to go to state prison for four to five months, after being caught doing the same thing eight years ago.

I think that, when you factor in the 3553(a) factors, just this guideline sentence, which is higher than the co-defendants, but she's held responsible for the entire breadth of all – the million dollars in loss for this small company, it sounds, in numbers – 87 to 108 months– that's between eight and nine years–that sounds like a lot of time, but when you factor in the clear choices that she made to continue for a solid two-year period stealing her company blind, all the while going to lunch with them, sitting around with them, celebrating birthdays with them, gaining their trust and stealing them blind, I think that she has demonstrated that she is, clearly, a person who has not learned from her past.  She has not learned from being given leniency in the past.  She has demonstrated that she is the serious recidivist that I mentioned in my sentencing memorandum. There is just no way around it.

And that is something that the Court can consider, that her criminal history does under-represent the likelihood that she will be a recidivist, which she's already shown she is, by stealing other people's money to the magnitude that she did this time around.

Then you factor in, too, what she did to this small company.

As I have previously told you, but I will say for the record again – I spent about an hour and a half with them almost a month ago, many of the people who worked side by side with Carla Johnson, and they told me a number of things that they wanted me to convey to the Court rather than stand up here and be too emotional for them to get their point across.

One of the things that she did, obviously, in addition to the pecuniary loss that is, again, a point for the Court to consider, as mentioned in the presentence report for a variance or an upward departure, is that she caused them to be – because of the things that she did with the books and sending all this money out to other individuals, she made them utilize what we can only be described as "bad information" in their records that they had to prepare their insurance company audits for the State Board of Insurance–I'm sorry–the State Department of Insurance.  It caused all sorts of problems when they ultimately were audited and reviewed, which caused additional problems which I have previously mentioned.

But they were put in the brink of receivership by the Texas Department of Insurance which, again, is a factor that the guidelines have not accounted for in this particular case, because it's directly attributable to her conduct, the fact that bad information was used to prepare audits which were obviously wrong. The State Department of Insurance had to give them, basically, an ultimatum. "We'll put you in a receivership where every decision that you make hasto go through us and be approved by what amounts to as some sort of trustee, and you will have to live like that with us overseeing every transaction in your business books for a couple of years."

Or they were given the opportunity to make a decision to change management, which

is ultimately what they decided to do, rather than to be put into a receivership situation. So, two individuals, one of whom was the son of the family–the owner of this business, lost their position. And I was told by all the individuals there that it was quite an embarrassing situation for all of them.

Now, the insurance business, like any other business, there is a community that you're known within and I think the phrase that was used was that, because of her conduct and her thievery there was a scandalous impact on this company in the community in which they operate, and that isn't accounted for by any guideline computation that's factored into a Level 28, Criminal History Category II.

In addition to that, one of the things that I hadn't realized was that they were such a small company and the manner in which the funds were stolen from accounts that were policyholders' deposits, their premium deposits– and say something bad happened. Not only would they have lost their business, this family business. People would have lost their jobs. And two people did lose their positions, they were demoted and they suffered a great deal of embarrassment. And why? Because they trusted her.

There's been a lot said that they should have been minding the store a little better. It's blaming the victim for doing what every company would like to do. Every organization, everybody, would like to be able to trust the person that they're relying on to do tasks for them; and that's, in essence, really what we have here. Not that they weren't minding the store. She created such a bond with them, such a level of trust with them, that they did trust her to take care of the financial records and accounting of that business, never knowing for one moment that she would steal them blind, which is what she did.

I think more than 108 months is warranted. I think at least 120 months would be more appropriate given all the circumstances, the conduct that the Defendant has, again, exhibited by stealing yet another company blind.

The Court: Anything you would like to say?

The Defendant: Yes, ma'am. Question. How is it – I'm sorry. I would like to ask–address her. How do they know that it came from — the money that I took came from the policyholders and not surplus? What facts are given? Okay?

And, also, did Columbia Lloyds loose their A-rating due to this? I know you said they went into receivership or had the option to go to receivership. So, if they would have went to receivership, should have the management not have lost their jobs? That's what I want to address.

The Court: Okay. Well, this is not the time or place for that. Okay?

The Defendant: Okay. But, other than that, what she says is absolutely true. I have no excuse. I have no reasons for what I have done.

Okay. First of all, I want to apologize to you for bringing this case to your court. I apologize to Columbia Lloyds. I should say there is no possible way that –the loyalty and the trust, it's just — I can't describe what I have been through after all this has happened.

And, like I said before, I'm not giving any excuses for what I did. There are no reasons. None whatsoever.

The only think I ask is leniency, you know, because the only think I have of retribution is restitution, trying to make as much, paying back as possible, as long as I live. That's the only thing I have to offer and that's not nearly enough. Okay? And, like I said, I am not asking for any special treatment, just leniency. And that's all I have to say.

                  \*                  \*                  \*

Mr. Cox. We filed a written response to the sentencing memorandum which basically outlines the argument that Miss Minnis just made.

I would just like to point out that the Government is asking you to upward-depart based on a couple of things, based on family ties under the Sentencing Guidelines, under 5H1.6, wherein that guideline clearly states that a family relationship or family ties are not relevant for departure purposes, and that is what they're basing their request for you to upward-depart on.

They also are aking you to depart under 2B1.1902 where she references the loss of position by employees at Columbia Lloyds. Miss Johnson is not making any excuses, but I would just like to point out to the Court there is no evidence that the reason why these upper-management people lost their positions was solely because of what Miss Johnson did. That's not an excuse.

I would just like to point out to the Court that we don't know why the state, when they came in, looked at these people's roles and their tasks and maybe their shortcomings in having a checks-and-balance system that they may have in their company. We don't know why they let those people go, and they're asking you to upward-depart based on that.

And we would argue to the Court that the sentence within the guideline range that she is at now takes into account all of the other shortcomings that the Government points out about Miss Johnson–her criminal history, her conduct in this case.

She was given a four-point increase because she was the most responsible for this,

because she was their leader. She received that aggravating role because of that. And, so, all of that, Your Honor, I would suggest, is already factored into the guideline range, and to ask the Court to increase that when there's no evidence under the guidelines that they cite or that they ask you to increase it with, I would argue to the Court, would not be warranted in this case.

And, so, we would argue that she should be sentenced within the guideline range as has been found by the Court already. (Document No. 242, p. 5-15).

Johnson was sentenced to a term of imprisonment of 120 months, to be followed by a three-year term os supervised release, $977,418.38 in restitution and a $100.00 special assessment. (Document No. 154, Transcript of Sentencing Hearing, Document No. 242, p. 17-19). In imposing a 120-month sentence, Judge Harmon stated:

> Carla Jean Johnson is before the Court this morning after entering a guilty plea to conspiracy to commit wire fraud. Miss Johnson became involved in this conspiracy to defraud Columbia Lloyds in July of 2007 and continued until July of 2009. She abused her position of trust at Columbia Lloyds to facilitate the creation of fraudulent checks which were written to friends and acquittances. Johnson, in turn, required the recipients to return the bulk of the funds to her in a variety of ways, such as via checks, wire transfers for cash.
>
> She is being held accountable as a leader of the criminal activity which involved five or more participants. Johnson's scheme involved 13 individuals who assisted her in facilitating the defrauding of Columbia Lloyds.
>
> The total intended loss caused by Johnson to Columbia Lloyds is $1,119,347.27. I'm sorry. Is that — I'm sorry. I am looking at the wrong piece of paper here.
>
> The total intended loss to Columbia Lloyds is $1,186,378.31, of which $977,418.38 was actual loss. Columbia Lloyds has since received a check for $250,000 from their insurance company, the Hartford Insurance Company. The outstanding restitution amount that Johnson owes to Columbia Lloyds is $702,418.38. Additionally, Johnson owes the Hartford Insurance Company $275,000 (verbatim) in restitution.
>
> As noted in the presentence report, Miss Johnson was previously convicted of theft of property relating to a similar embezzlement from [Nabors] Drilling in 2005 along with her boyfriend at the time, Royce Smith, who is a co-defendant in this case.
>
> I find the non-monetary loss suffered by the victim Columbia Lloyds was substantial and affected the company and the individuals involved in the company to a great degree, and I believe that that factor, together with all the totality of the

>circumstances, would dictate an upward departure from the high end of the guideline range and would reflect adequately the seriousness of the offense, promote respect for the law, provide deterrence to future criminal conduct and address the Defendant's background and characteristics as outline in 18, United States Code, Section 3553(a). (Document No. 242, p. 15-17).

Judgment was entered on September 21, 2011. (Document No. 158). She filed a Notice of Appeal (Document No. 165) but because she failed to timely pay the docketing fee, the Fifth Circuit United States Court of Appeals dismissed the appeal on November 2, 2011, for want of prosecution. (Document No. 174). The docket sheet shows that Johnson did not move to reinstate her appeal. The docket sheet further reveals that on or about September 4, 2012, and September 5, 2012, Johnson filed motions seeking to extend the time to file a "supporting memorandum to Petitioner's Motion under 28 U.S.C. § 2255.") (Document Nos. 224, 225). The undersigned Magistrate Judge denied both motions on September 6, 2012, noting that no motion for relief under § 2255 had been filed. (Document No. 227). Shortly thereafter, Johnson filed a "Motion to Defer Payment of Fine or Restitution Until Time of Release from Imprisonment and Placed on Supervised Release." (Document No. 229). Judge Harmon denied the motion on December 12, 2012. (Document No. 230). Johnson filed the instant § 2255 motion on October 14, 2014. (Document No. 235). The Government has moved to dismiss the motion as time-barred, and in the alternative, for failure to state a claim. (Document No. 249). According to the Government, to be timely, Johnson's § 2255 motion could have and should have been filed a year after the dismissal of her direct appeal by the Fifth Circuit, and the time to seek certiorari review passed. The Government further argues that even assuming that Johnson's § 2255 was timely filed, she is entitled to not relief as her challenges to calculation of her advisory guideline sentence are not viable under § 2255. Johnson has responded to the Government's motion to dismiss as time-barred. She responds that she only learned in 2014 that two employees of Columbia Lloyds retired from the company, James Robert "Bob" Sullivan"

who had served as President from 2005 to 2011 and Vice President of marketing since 2011, and Milby D. Dunn III, the founder of Columbia Lloyd's son and serving as Chairman of the Board of Underwriters. Johnson argues that the newly discovered evidence undermines the basis of her 120 month sentence which she claims was based on the termination of upper management as argued in the PSR and at her Sentencing. (Document No. 251, Exhibits A & B).

**II. Discussion**

    A. Johnson's § 2255 Motion is time-barred

The United States argues that Johnson's § 2255 Motion should be dismissed because it is time-barred. The Magistrate Judge agrees. On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was enacted. Pursuant to § 2255(f), the one-year limitation period begins to run from the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from filing by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Because Johnson filed the instant § 2255 motion after the effective date of AEDPA, the provisions of the statute apply. Johnson's appeal was dismissed for want of prosecution on November 8, 2011. Her conviction became final when the ninety-day period for filing a certiorari petition with the Supreme Court expired. on February 6, 2012. *See Clay v. United States*, 537 U.S.

522, 527 (2003) (holding that "[f]inality attaches when this Court affirms a conviction on the mertis on direct review or denied a petition for a writ of certiorari, or when the time for filing a certiorari petition express"); *United States v. Franks*, 397 Fed. App'x 95 (5th Cir. Oct. 6, 2010)(holding that a conviction becomes final when the ninety-day period for seeking a writ of certiorari expires, even where the appeal has been dismissed for lack of prosecution). Johnson's § 2255 Motion was filed on October 14, 2014, nearly twenty months after the expiration of the one-year limitations period. Thus under these circumstances, Johnson's § 2255 Motion is untimely under § 2255(f)(1), and is subject to dismissal absent a showing that an alternate date for commencement of the limitations period should be applied under § 2255(f)(2)-(4) or that the limitations period should be equitably tolled. The Government argues that Johnson's § 2255 Motion is subject to dismissal because none of the alternate dates for commencement of the limitations period apply and she has not shown that the limitations period should be equitably tolled.

As for the alternative commencement dates for the one year limitation period provided for in § 2255(f)(2), (3), and (4), none applies. Johnson has not alleged that he was in any way impeded from filing a timely § 2255 motion. Johnson appears to argue that the newly discovered evidence exception of § 2255(f)(4) applies. "In applying § 2255(f)(4), '[t]he important thing is to identify a particular time when . . . diligence is in order.'" *United States v. Jackson*, 470 Fed.Appx 324, 327 (5th Cir. 2012)(quoting *Johnson v. United States*, 544 U.S. 295, 308 (2005)). According to Johnson, she only became aware in 2014 of the retirement James Robert (Bob) Sullivan, and Milby D. Dunn II. Johnson argues that her sentence was enhanced based on the impact her criminal activity had on the then existing management of Columbia Lloyds, and in particular, the termination of James Robert (Bob) Sullivan, President, and Milby D. Dunn II, Vice President of Marketing. Here, the exhibits show that the two men retired from Columbia Lloyds. However, the underlying criminal

proceedings show that the men lost their *positions*, not their jobs. *See e.g.* (Document No. 242, p. 14 "And two people did lose their positions, they were demoted and they suffered a great deal of embarrassment."). Thus the new evidence does not undermine the Court's sentencing determination. In addition, this was not the only factor the upward departure was based. Johnson has not and cannot show that the facts underlying his claim could not have been discovered through the exercise of due diligence by the time her conviction was final. *See e.g., Johnson*, 544 U.S. at 308, 312 (holding that 3 years between entry of judgment and filing of habeas petition challenging the prior conviction did not constitute due diligence).

Furthermore, upon this record Johnson has not shown that the limitations period should be equitably tolled. The law is clear that only rare and exceptional circumstances may warrant the application of equitable tolling principles to an untimely filed § 2255 Motion to Vacate, Set Aside or Correct Sentence. *United States v. Petty*, 530 F.3d 361, 364-65 (5th Cir. 2008); *United States v. Patterson*, 211 F.3d 927, 930 (5th Cir. 2000). Equitable tolling, however, is not available if the Movant does not act diligently in attempting to meet the one year limitations deadline. *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999), *cert. denied*, 529 U.S. 1057 (2000). Additionally, the Fifth Circuit has approved the application of equitable tolling in very limited circumstances, "'principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his right.'" *Fierro* v. *Cockrell*, 294 F.3d 674, 682 (5th Cir. 2002)(quoting *Coleman*, 184 F.3d at 402. The Fifth had disapproved of the application of equitable tolling for circumstances which are "garden variety claims of excusable neglect." *Lockingbill v. Cockrell*, 239 F.3d 256, 265 (5th Cir. 2002). The Movant must show "'that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented a timely filing.'" *Holland v. Florida*, 130 S.Ct. 2549, 2562 (2010)(quoting *Pace v.*

*DiGugielmo*, 544 U.S. 408, 418); *see also Lawrence v. Florida*, 549 U.S. 327, 336 (2007).

Here, Johnson filed her § 2255 Motion twenty months too late. Given the absence of any facts in the record which would constitute rare and exceptional circumstances, equitable tolling of the limitations period is not applicable.

Because Johnson's §2255 Motion was not timely filed and because there are no grounds available to toll the limitations period, her § 2255 Motion should be denied as time-barred.

B.  Sentencing error claims are not cognizable in a § 2255 proceeding

Finally, the Government argues that even assuming that Johnson's § 2255 motion had been timely filed, her claims are without merit. Johnson's challenge to the upward departure does not state a claim cognizable under § 2255. *See United States v. Faubion,* 19 F.3d 226, 232 (5th Cir. 1994)*(*holding defendant's claim that district court erred in making upward departure under Sentencing Guidelines could not be considered in a § 2255 proceeding); *United States v. Walker*, 68 F.3d 931, 943 (5th Cir. 1995), *cert. denied*, 516 U.S. 1165 (1996) ("A district court's calculation under or application of the sentencing guidelines standing alone is not the type of error cognizable under section 2255.").

Johnson also argues that the Court used the wrong version of the United States Sentencing Guidelines Manual, applying the 2010 edition instead of the 2008 edition, her claim fails. The Constitution prohibits the enactment of any "ex post facto Law." U.S. Const. art. I, § 9, cl. 3. "A sentencing court must apply the version of the [Sentencing ] Guidelines effective at the time of sentencing unless application of that version would violate the Ex Post Facto Clause of the Constitution." *United States v. Rodarte-Vasquez*, 488 F.3d 316, 322 (5th Cir. 2007). A sentencing court violates the Ex Post Facto Clause when application of a current guideline "results in a more onerous penalty" than would application of a guideline in effect at the time of the offense. Here, the

Court applied the 2010 Sentencing guidelines, which were effective at the time of her sentencing hearing. The Fifth Circuit Court of Appeals has held that a sentencing court should generally apply the version of the Sentencing Guidelines in effect at the time of sentencing. *United States v. Ramos*, 509 F. App'x 317, 318 (5th Cir. 2013)(citing *United States v. Rodarte-Vasquez*, 488 F.3d 316, 322 (5th cir. 2007)). Moreover, the Ex Post Facto Clause was not violated because application of the advisory 2010 Sentencing Guidelines did not result in a more severe penalty. *See Peugh v. United States*, 133 S.Ct. 2072, 2078 (2013)("holding that sentencing a defendant "under Guidelines promulgated after he committed his criminal acts" violates the Ex Post Facto clause of the United States Constitution if "the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense').

### III. Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss as Time Barred/ Motion for Summary Judgment (Document No. 249) be GRANTED, and that Movant Carla Jean Johnson's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.235) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services*

*Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 14th day of August, 2015.

Frances H. Stacy
United States Magistrate Judge